*90 Lundberg Stratton, J.
I. Introduction
{¶ 1} The primary question before the court is whether the breach of a promise to execute an agreement justifies using promissory estoppel to remove the agreement from the statute of frauds. Ancillary to this question is whether a joint agreement can impose fiduciary duties absent compliance with the statute of frauds. We answer both questions in the negative. Accordingly, we reverse the judgment of the court of appeals.
II. Facts
{¶ 2} Appellant, ACE Capital Title Reinsurance Company (“ACE”), is a title reinsurance company located in New York. ACE is owned by several companies located in Bermuda (“Ace Group”). Appellees Sutton Land Services, L.L.C., Title First Agency, Inc., and Title Midwest, Inc. (“title agencies”) are title insurance companies located in New York, Ohio, and Kansas respectively. Appellee Olympic Holding Company, L.L.C., a Delaware company located in Columbus, was created by the title agencies in preparation for the proposed joint agreement herein to hold the stock of Olympic Title Insurance Company (“OTIC”).
{¶ 3} ACE approached the title agencies with a proposal to create a joint venture that would “revolutionize the title insurance industry by creating a new *91 and unique system of title insurance and reinsurance of national scope.”[1] ACE envisioned a new integrated system of title insurance and reinsurance that consisted of a residential real estate component (policy coverage up to $1,000,000) and a commercial real estate component (policy coverage over $1,000,000).
{¶ 4} The plan called for the title agencies to acquire OTIC, an Ohio title insurer. The title agencies would then use OTIC to underwrite title insurance policies that the title agencies issued for residential transactions. OTIC would reinsure these transactions through ACE. Meanwhile, ACE would issue title insurance policies for commercial transactions. OTIC would reinsure these transactions up to $100,000; ACE would provide the balance of the reinsurance.
{¶ 5} Before the plan could be implemented, the title agencies had to acquire OTIC, and the acquisition required approval by the Ohio Department of Insurance. Additionally, ACE would have to apply with the Ohio Department of Insurance to sell direct title insurance.
{¶ 6} In early 2003, the parties began negotiating by exchanging draft “term sheets” in an attempt to reach a consensus on the “general business terms” of the agreement. Each page of the term sheet contained the following disclaimer: “NOT AN OFFER OF INSURANCE.”
{¶ 7} In March 2003, the title agencies, through Sutton Land Services, initiated the acquisition of OTIC by sending OTIC a letter of intent to acquire. Thereafter, Sutton and the other two title agencies formed Olympic Holding Company, L.L.C. (referred to collectively as the “Olympic Group”), for the purpose of acquiring OTIC.
{¶ 8} From August 2003 through November 2003, ACE and the Olympic Group exchanged nine drafts of a proposed reinsurance agreement. The reinsurance agreement sought to define the obligations of the parties (ACE and OTIC) regarding issuing and underwriting direct title insurance and reinsurance for residential real estate deals. Each of these drafts contained contract-disclaimer language that provided:
{¶ 9} “This document is intended for discussion purposes only. Neither this document nor any other statement (oral or otherwise) made at any time in connection herewith is an offer, invitation or recommendation to enter into any transaction. Any offer would be made at a later date and subject to contract, satisfactory documentation and market conditions.” (Emphasis added.)
{¶ 10} Each draft also provided:
*92 {¶ 11} “This Agreement may be executed in any number of counterparts, and by the parties on separate counterparts, but will not be effective until each party has executed at least one counterpart.” (Emphasis added.)
{¶ 12} Each draft also referred to a “Capital Support Agreement.” On October 8, 2003, ACE circulated an initial draft of the capital-support agreement, which required the Olympic Group to maintain a minimum amount of capital for OTIC.
{¶ 13} Finally, each draft of the reinsurance agreement also required OTIC to enter into agreements with an agency that would write title-insurance policies for residential transactions, subject to ACE’s approval. On November 13, 2003, ACE circulated an “initial draft” of the “Model Agency Agreement” to Olympic Group. However, no agency agreement was ever executed by the parties.
{¶ 14} A commercial reinsurance agreement was discussed by the parties, but none was ever completed.
{¶ 15} On November 10, 2003, ACE submitted its application to the Ohio Department of Insurance to become licensed to sell title insurance.
{¶ 16} On November 6, 2003, the Olympic Group submitted its application to the Ohio Department of Insurance seeking approval to acquire OTIC. In support of its application, the Olympic Group attached an August 2003 draft of the residential reinsurance agreement. The draft was not executed. It had no contract-disclaimer language or capital-support provision.
{¶ 17} On December 2, 2003, the Ace Group announced a $1 billion initial public offering (“IPO”). ACE assured the Olympic Group that the IPO would not endanger the joint agreement and in fact could help it.
{¶ 18} After obtaining approval from the Ohio Department of Insurance, the Olympic Group closed on the acquisition of OTIC on December 29, 2003. That same week, ACE’s chief operating officer became aware that ACE would not go forward with the joint agreement. On January 2, 2004, ACE informed the Olympic Group that ACE would probably be spun off and that it was unlikely to proceed with the proposed reinsurance agreement.
{¶ 19} The day after learning of ACE’s cancellation, the Olympic Group signed and sent its own draft of the residential reinsurance agreement to ACE for signature. ACE refused to execute the agreement.
{¶ 20} In January 2004, the Olympic Group filed a multicount complaint against ACE and the Ace Group. The trial court dismissed the Bermuda-based Ace Group for lack of personal jurisdiction, and the Olympic Group then voluntarily dismissed the complaint.
{¶ 21} In 2006, the Olympic Group refiled the complaint against ACE and Ace Group. The trial court again dismissed the Ace Group. The complaint alleged *93 ten causes of action, including breach of a joint-venture agreement, breach of fiduciary duty, promissory estoppel, negligent misrepresentation, tortious interference with a contractual relationship, tortious interference with a business relationship, and fraud. The title agencies sought specific performance of the joint-venture agreement and damages, including punitive damages.
{¶ 22} ACE filed a motion for summary judgment claiming that the agreement did not comply with the statute of frauds, R.C. 1335.05. The Olympic Group argued that promissory estoppel removed the agreements from the statute of frauds.
{¶ 23} The trial court held that promissory estoppel did not remove this agreement from the statute of frauds, and therefore, the Olympic Group could not use promissory estoppel to bar ACE from asserting the statute of frauds as an affirmative defense to Olympic Group’s breach-of-contract claims. Because the trial court could find no agreement that complied with the statute of frauds, it granted summary judgment in favor of ACE as to specific performance and on Olympic Group’s breach-of-contract, breach-of-fiduciary-duty, and negligent-misrepresentation claims. However, the court held that the Olympic Group’s claim of promissory estoppel, seeking detrimental-reliance damages, survived summary judgment, as did its claims for tortious interference with contractual and business relationships.
{¶ 24} On appeal, the court of appeals dismissed Olympic Group’s assignments of error pertaining to promissory estoppel and fraud for lack of a final, appealable order. Olympic Holding Co. v. ACE Ltd., Franklin App. No. 07AP-168, 2007-Ohio-6643, 2007 WL 4340276, ¶ 62. After examining Olympic Group’s remaining assignments of error, the court of appeals affirmed the trial court’s judgment in part and reversed it in part. Id. at ¶ 102.
{¶ 25} The court of appeals reversed the trial court’s summary judgment in favor of ACE on the Olympic Group’s breach-of-contract claim and breach-of-fiduciary-duty claim. Olympic Holding Co., 2007-Ohio-6643, 2007 WL 4340276, ¶ 103. With regard to the contract claims, the court of appeals held that there were genuine issues of material fact as to whether the parties had reached an agreement and that ACE had promised that it would execute the agreement after the Olympic Group acquired OTIC. Id. at ¶ 11. The court, determining that ACE had never intended to go through with its promise, further held that “[u]nder these circumstances, it is appropriate to allow appellants to assert the equitable doctrine of promissory estoppel,” and therefore, ACE “should be equitably estopped from using the affirmative defense of the statute of frauds because of a misrepresentation to supply signed written memoranda of the parties’ agreements.” Id. at ¶ 48.
*94 {¶ 26} In reversing the judgment in favor of ACE regarding Olympic Group’s claim for breach of fiduciary duty, the court of appeals held that a joint venture can be express or implied, and therefore, “ ‘joint venturers may incur fiduciary obligations to each other regardless of whether any written agreement is then in force, since such a writing is not necessary for the creation of such a venture.’ ” Olympic Holding Co., 2007-Ohio-6643, 2007 WL 4340276, ¶ 54, quoting Doctors Hosp. v. Hazelbaker (1995), 106 Ohio App.3d 305, 309-310, 665 N.E.2d 1175. Relying on testimony from ACE pertaining to the nature of its relationship with the Olympic Group, the court determined that there was at least a genuine issue of material fact as to whether there was a fiduciary duty between the parties. Id. at ¶ 55.
{¶ 27} The court of appeals otherwise affirmed the trial court’s judgment or found Olympic Group’s remaining assignments of error moot. Id. at ¶ 103.
{¶ 28} This cause is before this court upon our acceptance of ACE’s discretionary appeal. Olympic Holding Co., L.L.C. v. ACE Ltd., 117 Ohio St.3d 1496, 2008-Ohio-2028, 885 N.E.2d 954.
III. Analysis

A. The Breach of a Promise to Sign an Agreement Does Not Justify Using Promissory Estoppel to Remove the Agreement from the Statute of Frauds

{¶ 29} We begin by examining whether breaching a promise to execute an agreement equitably removes the agreement from the statute of frauds. We recognize that numerous jurisdictions have held that under various circumstances, promissory estoppel may be used to remove an agreement from having to comply with the statute of frauds. See Annotation, Promissory Estoppel as Basis for Avoidance of Statute of Frauds (1974), 56 A.L.R.3d 1037, 1974 WL 35112. However, we decline to adopt that exception under the circumstances of this case because it is both unnecessary and damaging to the protections afforded by the statute of frauds.
{¶ 30} R.C. 1335.05, Ohio’s codification of the statute of frauds, provides:
{¶ 31} “No action shall be brought whereby to charge * * * a person upon an agreement * * * that is not to be performed within one year from the making thereof; unless the agreement upon which such action is brought, or some memorandum or note thereof, is in writing and signed by the party to be charged therewith * * (Emphasis added.)
{¶ 32} Agreements that do not comply with the statute of frauds are unenforceable. Hummel v. Hummel (1938), 133 Ohio St. 520, 11 O.O. 221, 14 N.E.2d 923, paragraph one of the syllabus. See also Shepherd v. Westlake (1991), 76 Ohio *95 App.3d 3, 10, 600 N.E.2d 1095; DeCavitch v. Thomas Steel Strip Corp. (1990), 66 Ohio App.3d 568, 572, 585 N.E.2d 879.
{¶ 33} The purpose of the statute of frauds is to prevent “frauds and perjuries.” Wilber v. Paine (1824), 1 Ohio 251, 255. The statute does so by informing the public and judges of what is needed to form a contract and by encouraging parties to follow these requirements by nullifying those agreements that do not comply. “[T]he statute of frauds is supposed both to make people take notice of the legal consequences of a writing and to reduce the occasions on which judges enforce non-existent contracts because of perjured evidence.” Kennedy, Form and Substance in Private Law Adjudication (1976), 89 Harv.L.Rev. 1685, 1691. “In every case, the formality means that unless the parties adopt the prescribed mode of manifesting their wishes, they will be ignored. The reason for ignoring them, for applying the sanction of nullity, is to force them to be self conscious and to express themselves clearly * * Id. at 1692.
{¶ 34} Courts have long recognized that a signed contract constitutes a party’s final expression of its agreement. See Fillinger Constr. Inc. v. Coon (Sept. 28, 1993), Greene App. No. 93-CA-0002, 1993 WL 386320, *3 (“contract signed by Coon constituted the final expression of the agreement of the parties” [emphasis added]); Breed, Elliott & Harrison v. Lima (1920), 12 Ohio App. 485, 1920 WL 711, *3, quoting Bunday v. Huntington (C.A.8, 1915), 224 F. 847, 853 (executed contract “ ‘is presumed to express the final agreement of the parties’ ” [emphasis added]). Thus, the statute of frauds is necessary because a “signed writing provides greater assurance that the parties and the public can reliably know when such a transaction occurs.” Seale v. Citizens S. & L. Assn. (C.A.6, 1986), 806 F.2d 99, 104.
{¶ 35} If promissory estoppel is used as a bar to the writing requirements imposed by the statute of frauds, based on a party’s oral promise to execute the agreement, the predictability that the statute of frauds brings to contract formation would be eroded. Parties negotiating a contract would no longer know what signifies a final agreement. Promissory estoppel used this way would open contract negotiations to fraud, the very evil that the statute of frauds seeks to prevent. Thus, “[t]o allow [a] plaintiff to recover on a theory of promissory estoppel where the oral contract is precluded by the Statute of Frauds, ‘ “would abrogate the purpose and intent of the legislature in enacting the statute of frauds and would nullify its fundamental requirements.” ’ ” Essco Geometric, Inc. v. Harvard Industries, Inc. (Sept. 30, 1993), E.D.Mo. No. 90-1354C(6), 1993 WL 766952, *3, quoting Sales Serv. v. Daewoo Intenatl. (Am.) (Mo.App.1989), 770 S.W.2d 453, 457, quoting Morsinkhoff v. Deluxe Laundry & Dry Cleaning Co. (Mo.App.1961), 344 S.W.2d 639, 644. See also Kahn v. Cecelia Co. (D.C.N.Y. 1941), 40 F.Supp. 878, 880, quoting Deutsch v. Textile Waste Merchandising Co. *96 (1925), 212 A.D. 681, 685, 209 N.Y.S. 388 (declining to enforce an oral agreement because enforcing a promise that the defendant would reduce the agreement to writing would result in the “ ‘practical nullification of the statute of frauds’ ”).
{¶ 36} We decline to recognize an exception to the statute of frauds even when the promise to execute an agreement is fraudulent or misleading. If a party establishes that a promise to execute an agreement is misleading or fraudulent, promissory estoppel is an equitable remedy available to recover reliance damages.
{¶ 37} As recognized by the Supreme Court of Utah, “[i]n most instances of negotiations for transactions included within the Statute [of Frauds], a reduction of the contract to writing is contemplated and, in all probability, the parties will discuss who will draw the instrument and when and where it will be signed.” Easton v. Wycoff (1956), 4 Utah 2d 386, 388-389, 295 P.2d 332. However, until parties execute the agreement, “ ‘[r]eliance on a statement of future intent made prior to the conclusion of negotiations in a complex business transaction is unreasonable as a matter of law. * * * Such a rule is particularly appropriate when two sophisticated business entities are involved in negotiations. “Until the documents are signed and delivered the game is not over. Businessmen would be undesirably inhibited in their dealings if expressions of intent and the exchange of drafts were taken as legally binding agreements.” ’ ” Carcorp, Inc. v. Chesrown Oldsmobile-GMC Truck, Inc., Franklin App. No. 06AP-329, 2007-Ohio-380, 2007 WL 259248, ¶ 20, quoting Continental Fin. Servs. Co. v. First Natl. Boston Corp. (Aug. 30,1984), D.Mass. No. CA-82-1505-T, at 9-10, quoting Tull v. Mister Donut Dev. Corp. (1979), 7 Mass.App. 626, 632, 389 N.E.2d 447.
{¶ 38} Accordingly, we hold that a party may not use promissory estoppel to bar the opposing party from asserting the affirmative defense of the statute of frauds, which requires that an enforceable contract be in writing and signed by the party to be charged, but may pursue promissory estoppel as a separate remedy for damages.

B. Promissory Estoppel as an Action for Damages Provides an Adequate Remedy for Detrimental Reliance on a Breached Promise

{¶ 39} An action for damages under promissory estoppel provides an adequate remedy for an unfulfilled or fraudulent promise. “The doctrine of promissory estoppel comes into play where the requisites of contract are not met, yet the promise should be enforced to avoid injustice.” Doe v. Univision Television Group, Inc. (Fla.App.1998), 717 So.2d 63, 65, citing Restatement of the Law 2d, Contracts (1981) Section 90; see also Cohen v. Cowles Media Co. (Minn.1992), 479 N.W.2d 387, 389. We adopted promissory estoppel through the Restatement of the Law 2d, Contracts (1973), Section 90 in Talley v. Teamsters, Chauffeurs, Warehousemen, & Helpers, Local No. 377 (1976), 48 Ohio St.2d 142, 146, 2 O.O.3d *97 297, 357 N.E.2d 44. “To be successful on a claim of promissory estoppel, ‘[t]he party claiming the estoppel must have relied on conduct of an adversary in such a manner as to change his position for the worse and that reliance must have been reasonable in that the party claiming estoppel did not know and could not have known that its adversary’s conduct was misleading.’ ” Shampton v. Springboro, 98 Ohio St.3d 457, 2003-Ohio-1913, 786 N.E.2d 883, ¶ 34, quoting Ohio State Bd. of Pharmacy v. Frantz (1990), 51 Ohio St.3d 143, 145, 555 N.E.2d 630, citing Heckler v. Community Health Serv. (1984), 467 U.S. 51, 59, 104 S.Ct. 2218, 81 L.Ed.2d 42.
{¶ 40} Thus, promissory estoppel is an adequate remedy for a fraudulent oral promise or breach of an oral promise, absent a signed agreement. See Karnes v. Doctors Hosp. (1990), 51 Ohio St.3d 139, 142, 555 N.E.2d 280 (promissory estoppel is an “equitable doctrine designed to prevent the harm resulting from the reasonable and detrimental reliance of [the promisee] upon the false representations of [the promisor]” [emphasis added]).

C. A Joint Venture Agreement that Does Not Comply with the Statute of Frauds Cannot Impose Fiduciary Duties

{¶ 41} Next, we examine whether a joint-venture agreement that does not comply with the statute of frauds can impose fiduciary duties upon the parties.
{¶ 42} The court of appeals below, quoting Doctors Hosp. v. Hazelbaker (1995), 106 Ohio App.3d 305, 310-311, 665 N.E.2d 1175, held, “ ‘[J]oint venturers may incur fiduciary obligations to each other regardless of whether any written agreement is then in force, since such a writing is not necessary for the creation of such a venture.’ ”
{¶ 43} Hazelbaker relied on Al Johnson Constr. Co. v. Kosydar (1975), 42 Ohio St.2d 29, 71 O.O.2d 16, 325 N.E.2d 549, paragraph one of the syllabus, for the proposition that a joint venture may be implied. In Al Johnson, a signed agreement was not at issue. The facts involved parties who had entered into a joint venture for construction and had completed the construction. Id. at 30, 71 O.O.2d 16, 325 N.E.2d 549. The dispute was whether the joint venture or the individual venturers should pay the tax imposed on the project. Id. at 31, 71 O.O.2d 16, 325 N.E.2d 549. The parties in Al Johnson actively engaged in and completed the joint venture, as opposed to merely promising to enter an agreement. Full performance removed the agreement in Al Johnson from the statute of frauds. See Rutledge v. Hoffman (1947), 81 Ohio App. 85, 36 O.O. 405, 75 N.E.2d 608, paragraph five of the syllabus.
{¶ 44} In Hazelbaker, the parties did enter into several signed agreements. While the Tenth District Court of Appeals, relying on Al Johnson, asserted that the parties, a medical corporation and a nursing-home developer, formed a joint *98 venture before signing the agreement, the court ironically held that the joint-venture oral agreements did not obligate one party to proceed at all with the project at that stage, as there was no obligation on the part of the medical center to continue with the joint venture. Hazelbaker, 106 Ohio App.3d at 312, 665 N.E.2d 1175. The court of appeals stated: “Doctors was, at that time, free to forgo participation in the retirement center project at all, so Hazelbaker could not assert a firm expectation to the $4.5 million in credit enhancements which Doctors was to provide, if it was to participate in the retirement center project.” (Emphasis sic.) Id. at 311, 665 N.E.2d 1175.
{¶ 45} In this case, the dispute over what constituted a joint venture or what the parties’ obligations were before the contracts were even signed demonstrates the policy reasons that underlie the statute of frauds. We reject Hazelbaker’s application of Al Johnson.
{¶ 46} In Garg v. Venkataraman (1988), 54 Ohio App.3d 171, 172-173, 561 N.E.2d 1005, the court stated, “While joint venture agreements may be oral, they are, nonetheless, still contracts, and thus subject to all of the applicable requirements of contract law, including the Statute of Frauds.” Thus, Garg held that if a joint-venture agreement does not comply with the statute of frauds, it is unenforceable and cannot impose any fiduciary duties upon the parties. Id. at 172, 561 N.E.2d 1005. We agree with Garg and therefore hold that a joint-venture agreement that does not comply with the statute of frauds is unenforceable, and an unenforceable joint-venture agreement cannot impose any fiduciary duties on the parties.

D. The Statute of Frauds Applies to the Proposed Joint Agreement

{¶ 47} In the court of appeals, two of Olympic Group’s assignments of error asserted that the trial court erred in granting summary judgment on plaintiffs contract claims (1) because the parties’ agreements were capable of performance in one year and thus fell outside the statute of frauds and (2) because there were signed writings chargeable against ACE defendants that satisfy the statute of frauds. Based on its reversal of the trial court’s judgment on other grounds, the court of appeals overruled these two assignments of error as being moot. In the interest of judicial economy, we now resolve these assignments of error.
{¶ 48} The statute of frauds applies to agreements that cannot be performed within a year. R.C. 1335.05. When parties to an alleged agreement did not intend the agreement to be performed in less than a year, the statute of frauds renders that agreement unenforceable. Pro Arts Inc. v. K Mart Corp. (N.D.Ohio 1984), 580 F.Supp. 1073, 1075; see also Lingo v. Ohio Cent. RR., Franklin App. No. 05AP-206, 2006-Ohio-2268, 2006 WL 1230679, ¶ 44, 47.
*99 {¶ 49} In the instant case, the parties envisioned that the proposed joint agreement would last five years. Therefore, the proposed joint-venture agreement in the instant case comes within the statute of frauds.
{¶ 50} With regard to Olympic Group’s assertion that the requisite writings exist, we find nothing in the record of a final agreement that satisfies the statute of frauds. The draft term sheets exchanged by the parties in an attempt to negotiate a joint-venture agreement all contained contract-disclaimer language, and none were signed by ACE. There is no commercial reinsurance agreement. And there is no signed residential reinsurance agreement. Finally, there is no written joint-venture agreement. There are simply no documents that sufficiently satisfy the writings required by the statute of frauds.
IV. Conclusion
{¶ 51} We hold that the breach of an oral promise to sign an agreement does not remove an agreement from the signing requirement of the statute of frauds. Consequently, a party may not use promissory estoppel to bar the opposing party from asserting the affirmative defense of the statute of frauds, which requires that an enforceable contract must be in writing and signed by the party to be charged.
{¶ 52} Because there are no documents that comply with the statute of frauds, the proposed joint agreement for insurance and reinsurance is unenforceable. And because the joint agreement is not enforceable, it imposes no fiduciary duties on the parties. Finally, Olympic Group has a promissory estoppel claim for reliance damages pending in the trial court, which is an adequate remedy to recover damages it sustained in detrimentally relying upon ACE’s allegedly false promise.
{¶ 53} Accordingly, we reverse the judgment of the court of appeals and remand the cause to the trial court for further proceedings not inconsistent with this opinion.
Judgment reversed and cause remanded.
Moyer, C.J., and O’Connor, Lanzinger, and Cupp, JJ., concur.
Pfeifer and O’Donnell, JJ., dissent.

. “Title insurance” is “[a]n agreement to indemnify against loss arising from a defect in title to real property.” Black’s Law Dictionary (8th Ed.2004) 819. Reinsurance is “[ijnsurance of all or part of one insurer’s risk by a second insurer, who accepts the risk in exchange for a percentage of the original premium.” Id. at 1312.